IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-183

Filed 3 December 2025

Wake County, No. 19CVS013093-910

SOUTHLAND NATIONAL INSURANCE CORPORATION in Liquidation, BANKERS LIFE INSURANCE COMPANY in Rehabilitation, COLORADO BANKERS LIFE INSURANCE COMPANY, in Rehabilitation, and SOUTHLAND NATIONAL REINSURANCE CORPORATION, in Rehabilitation, Plaintiffs,

v.

GREG E. LINDBERG, GLOBAL GROWTH HOLDINGS, LLC, EDWARDS MILL ASSET MANAGEMENT, LLC, NEW ENGLAND CAPITAL, LLC, and PRIVATE BANKERS LIFE AND ANNUITY CO., LTD., Defendants.

Appeal by defendants from an order entered 30 August 2024 by Judge A. Graham Shirley II in Wake County Superior Court. Heard in the Court of Appeals 26 August 2025.

*Monica Langdon Jackson, for defendants-appellants.*

*Michael G. Newell, for defendants-appellants.*

*Williams Mullen, by Wes J. Camden, Caitlin M. Poe, Lauren E. Fussell, for plaintiffs-appellees.*

FLOOD, Judge.

Defendant Greg E. Lindberg and Defendant Global Growth Holdings, LLC ("Global Growth") (collectively, "Defendants") appeal from the trial court's order holding them in civil contempt for violation of a Temporary Restraining Order. Upon careful review, we affirm the trial court's civil contempt order.

## I. <u>Factual and Procedural Background</u>

The following factual and procedural background is derived in part from the facts set forth in this Court's prior opinion of *Southland Nat'l Ins. Corp. v. Lindberg*, 289 N.C. App. 378 (2023), issued upon Defendants Greg E. Lindberg, Global Growth Holdings, Inc. f/k/a Academy Association, Inc., and New England Capital, LLC's prior appeal to this Court.

*The Plan*

Southland National Insurance Corporation, Bankers Life Insurance Company, Colorado Bankers Life Insurance Company, and Southland National Reinsurance Corporation (collectively, "Plaintiffs") are insolvent insurers, who were purchased by Defendant Lindberg in 2014.

In 2014, Lindberg re-domesticated Plaintiffs to North Carolina in order to take advantage of this State's favorable regulations as to insurance companies' investments. Prior to this re-domestication, Lindberg, acting as owner of Plaintiffs, made a special agreement with former North Carolina Commissioner of Insurance, Wayne Goodwin, allowing Lindberg to invest up to forty percent of Plaintiffs' assets into Lindberg's affiliated business entities. Lindberg then invested up to forty percent of Plaintiffs' money into the purchase of other, non-insurance companies, also owned by Lindberg. Simply put, Lindberg created a scheme in which he caused $1.2 billion

that was held for Plaintiffs' policyholders to be invested into other non-insurance companies he also owned or controlled.

In November 2016, Wayne Goodwin lost re-election and his seat as Commissioner of Insurance to Mike Causey, who then reduced the cap on affiliated investments from forty percent to ten percent. Lindberg struggled to untangle his affiliated investments and, as the deadline for diversification drew near, the North Carolina Department of Insurance ("NCDOI") grew concerned over "mismatch between investments and policyholder liabilities." In other words, because Lindberg had invested so much of Plaintiffs' money into his affiliated companies, NCDOI worried Plaintiffs might experience a shortfall on their obligation to pay claims by individual policyholders.

To address this problem, in June 2019, Lindberg and many of his companies entered into a series of agreements with Plaintiffs for timely repayment of the policyholders, and Plaintiffs gave one of Lindberg's companies an additional $40 million loan to prevent his non-insurance borrower companies from immediate collapse. They also agreed to grant Lindberg's borrower companies more favorable lending terms to facilitate them paying the loans over a longer period. These agreements resulted in the parties entering into, *inter alia*, a Memorandum of Understanding (the "MOU") on 27 June 2019, wherein Lindberg agreed that, on or before 30 September 2019, the borrower companies—or Specified Affiliated

Companies (the "SACs")—would be placed under a New Holding Company governed by an independent board, charged with protecting Plaintiffs' policyholders. These companies were called SACs because, as the MOU provided, some of the affiliated companies—companies either directly or indirectly owned and controlled by Lindberg—would not be contributed to the New Holding Company and would remain under Lindberg's control. On the same day the parties entered into the MOU, Lindberg agreed to have Plaintiffs enter into rehabilitation. During the period of rehabilitation and upon execution of the MOU, Defendants had either direct or indirect control over most of the SACs and the authority to contribute those entities to the New Holding Company.

*The Breach*

On 1 October 2019, Plaintiffs filed suit against Defendants for breach of the MOU and fraud, alleging Lindberg failed to make the SACs subsidiaries of the New Holding Company on or before 30 September 2019. Plaintiffs requested specific performance of the MOU, compensatory damages, and punitive damages. Plaintiffs also filed a Motion for Preliminary Injunction and sought a Temporary Restraining Order (the "TRO") against Defendants. The TRO, which was approved by the trial court, prohibited Defendants from, *inter alia*, selling, encumbering, or otherwise devaluing the SACs. The TRO also contained restrictions on, not just the SACs, but any company affiliated with Lindberg because Lindberg had created a complex web

of companies and investments through which he controlled the flow of capital—which included "multiple tiers of operating and holding companies; loans that had been syndicated and repackaged, then transferred several times; underlying loan agreements and sellers' notes; equity equivalence agreements; and third-party financing agreements." *Southland Nat'l Ins. Corp.*, 289 N.C. App. at 392. Finally, the TRO restrained Defendants from dissipating their own assets. On 7 October 2019, with the consent of the parties, the trial court entered a Consent Extension of the TRO, for which there has yet to be a hearing.

*The Trial Court's Initial Order and the Parties' Initial Appeal*

After a bench trial held by the trial court from 21 June to 30 June 2021, the trial court entered a judgment in favor of Plaintiffs, and ordered specific performance of the MOU, but not compensatory or punitive damages. On 26 May 2022, the trial court entered an Amended Judgment and Order to correct clerical errors. On 13 June 2022, Defendants appealed to this Court from the Amended Judgment and Order. On 21 June 2022, Plaintiffs cross-appealed on the narrow issue of whether the trial court erred in failing to award fraud damages. On 20 June 2023, this Court issued its opinion, affirming the trial court's award of specific performance of the MOU and directing the trial court to enter an immediate award of damages in favor of Plaintiffs. *Id.* at 394.

After this Court issued its opinion, Defendants petitioned the Supreme Court for discretionary review. On 13 December 2023, the Supreme Court granted Defendants' petition for discretionary review in part, reviewing only the issue of whether Plaintiffs' reliance on Defendants' fraudulent representations was reasonable. *See Southland Nat'l Ins. Corp. v. Lindberg*, 385 N.C. 610 (2023). Our Supreme Court heard oral arguments on 24 October 2024, and on 17 October 2025, the Supreme Court concluded "that Defendants' petition for discretionary review was improvidently allowed by order on 13 December 2023." *Southland Nat'l Ins. Corp. v. Lindberg*, 920 S.E.2d 504 (2025) (*per curiam*).

*Plaintiffs' Motion for an Order to Show Cause and the Modified TRO*

On 18 November 2022, Plaintiffs filed their Motion for Order to Show Cause, along with supporting materials, requesting the trial court to issue an order directing Defendants to appear and show why they should not be held in civil contempt for their apparent violations of the TRO. The trial court granted Plaintiffs' motion on 21 December 2022. On 5 January 2023, Plaintiffs moved to withdraw their Motion for Order to Show Cause and "refile the motion following additional analysis of Defendants' financial transactions"; the motion was granted by the trial court later the same day.

On 15 April 2024, Plaintiffs filed a Verified Renewed Motion for Order to Show Cause, wherein Plaintiffs again requested for the trial court to find probable cause

exists that Defendants violated the TRO and to enter an order directing Defendants to appear and show why they should not be held in contempt. In their motion, Plaintiffs alleged an analysis of financial records revealed that, between October 2019 and January 2023, Defendants violated the TRO through numerous transactions totaling tens of millions of dollars.

To support their allegations, Plaintiffs attached to their motion an affidavit of forensic accountant, Carey Miller, in which Miller identified the flow of funds on a transaction-by-transaction basis. Plaintiffs argued Miller had identified two transactions whereby Defendants had violated the TRO: first, Defendants had transferred a net amount of approximately $64 million from Global Growth and the SACs to personal entities Lindberg had used to avoid holding assets in his own name (the "Lindberg Personal Vehicles"), and second, a group of the SACs—the financing companies, or the "FinCos,"—transferred a net total of approximately $65 million to Global Growth. Plaintiffs alleged the former transaction violated the TRO because these funds were transferred to personal-use entities and were not used for ordinary business expenses. As to the latter transaction, Plaintiffs argued Defendants violated the TRO's provision prohibiting distributions because the FinCos are shell companies that were run entirely by Defendants.

As a result of Defendants' violations, on 10 May 2024, the trial court entered an order modifying the TRO (the "Modified TRO"). In its order, the trial court stated

that the 1 October 2019 TRO's restrictions would continue to apply, and imposed additional restrictions on Defendants, including a restraint on engaging in transactions of funds from the SACs over $10,000, without prior court approval. The trial court also ordered imposition of a limited receiver over Global Growth, to monitor compliance with the Modified TRO. After his appointment, the limited receiver submitted a report, identifying various transactions Global Growth made in May 2024 that potentially violated the Modified TRO including: a transfer of $633 million of preferred equity in Global Growth; a payment of over $500,000 of Lindberg's personal expenses; and a payment of over $1 million to a non-SAC company controlled by Lindberg.

Based on these reported violations, on 12 July 2024, the trial court entered an order wherein the court further amended the Modified TRO (the "Re-Modified TRO"), lowering the threshold amount for restrained transactions to $5,000, and clarifying that the restriction applies to transfers by Lindberg or Global Growth, even if the relevant funds originate from non-SAC companies. That same day, Defendants filed a motion asking the trial court to permit the limited receiver to approve transactions of over $5,000, specifically from the SACs to fund Global Growth expenses. In response to this motion, on 17 July 2024, the limited receiver filed a response stating, *inter alia,* that due to Defendants' "numerous flagrant and repeated violations of the

TRO," he would be unlikely to approve the requested transactions. On 29 July 2024, the trial court denied Defendants' motion.[1]

*The Trial Court's Order to Show Cause*

On 16 April 2024, the day after Plaintiffs filed their Verified Renewed Motion for an Order to Show Cause, Defendants filed a motion requesting, *inter alia*, a continuance of the show cause hearing to allow them to depose Miller and to retain their own rebuttal expert. In their response, Plaintiffs consented to a discovery period limited to expert issues, and presented a proposed discovery schedule.

On 22 April 2024, the trial court heard several pending motions, including the two motions set forth herein. During the hearing, when discussing a potential discovery schedule before the show cause hearing, Defendants' counsel requested to disclose their expert reports after deposing Miller. The trial court rejected Defendants' request, and Defendants did not otherwise object to Plaintiffs' proposed discovery schedule.

On 16 May 2024, the trial court entered its order memorializing its oral rulings from the 22 April 2024 hearing. The trial court found that probable cause supported a finding that Defendants violated the Modified TRO, set the show cause hearing for 1 August 2024, and required "Lindberg and a representative for [Global Growth] . . .

---

[1] We note that Defendants appealed from the trial court's 12 July and 29 July 2024 orders, but that appeal is separate from this appeal.

to personally appear[.]" Finally, the trial court set a schedule for a limited expert discovery period.

On 17 June 2024, Defendants filed a notice of rebuttal expert designations, designating Michael Fahlman and Emilio Mendoza as "experts who may offer testimony in the show cause hearing to rebut the opinions of" Miller. Defendants did not attach a report or opinion to their notice of rebuttal expert designations but stated Fahlman and Mendoza would provide opinions after Defendants deposed Miller. In response to Defendants' notice, Plaintiffs filed a motion in *limine*, alleging Defendants' notice was non-compliant and requesting the trial court prevent Defendants from introducing expert testimony at the show cause hearing. The trial court held a hearing for Plaintiffs' motion on 10 July 2024, where Defendants orally moved for a continuance because, as Defendants' counsel admitted, one of their experts had refused Defendants' request to do more work because they had not paid for his previous work. The trial court found Defendants had failed to show good cause for an extension of time to serve expert reports, and on 18 July 2024, entered an order granting Plaintiffs' motion in *limine*.

*The Show Cause Hearing*

The trial court held the show cause hearing on 1 August 2024. Global Growth's chief operating officer Robert "Bo" Gaddy appeared at the hearing as a representative of Global Growth; Lindberg, however, did not appear, and his counsel was unable to

explain his absence. Due to Lindberg's failure to appear, the trial court held Lindberg in criminal contempt and issued a warrant for Lindberg's arrest.

After the trial court explained to the parties that Defendants had the burden of proving why they should not be held in contempt, counsel for Defendants introduced numerous exhibits and deposition transcripts. Gaddy and Global Growth's chief financial officer, Surinder Jain, also testified as to why Defendants should not be held in civil contempt.

Plaintiffs presented testimonial evidence from the following witnesses: Miller; Peter Nordberg, Global Growth's former general counsel; and John Hulbert, a representative for a Lindberg-affiliated company known as American Academy of Professional Coders ("AAPC").

Miller testified about her review and analysis of financial records from 1 October 2019 through 31 January 2023. Miller testified that her findings show "[t]he FinCos transferred $67 million in cash to [Global Growth] between October of 2019 and April of 2022." In summarizing her findings regarding transfers from Global Growth and the SACs to the Lindberg Personal Vehicles, Miller testified, "[o]n a net basis, [Global Growth] transferred just over $64 million to the Lindberg [P]ersonal [V]ehicles, and the SACs transferred just over $18 million to the Lindberg [P]ersonal [V]ehicles for a total of about $83 million . . . ."

Hulbert testified regarding a potential sale of AAPC. Hulbert specifically testified that if sold, the net proceeds—which Hulbert believed would exceed $70 million—would flow to a trust and then to Global Growth. After Defendants' counsel objected to Hulbert's testimony, based on relevance, the trial court stated it was considering Hulbert's testimony to determine if Defendants had an asset that could be liquidated:

> [L]et me tell you where my mind's going. They could decide to sell, and if they do sell, that money could be used to pay any funds that this [c]ourt requires to purge [Global Growth] and [] Lindberg of contempt. The only hurdle being that [] Lindberg or [Global Growth] could stop the sale. So it appears that there is an asset that can be liquidated that Global [Growth] – at least as of right – sitting here right now, that could be liquidated to – if this [c]ourt deems it necessary to enter an order requiring to transfer a certain amount of funds back.

Hulbert further testified that, as long as Global Growth did not exercise its veto power of such a sale, AAPC would be willing to enter a sale process, and the sale process would take approximately six to twelve months.

*The Trial Court's Order of Contempt*

On 8 August 2024, the trial court heard arguments from the parties regarding the evidence presented at the show cause hearing. The trial court entered an order, on 30 August 2024, holding Defendants in civil contempt (the "Contempt Order"). In the Contempt Order, the trial court found: (1) the net total of funds Global Growth sent to entities that Lindberg used for personal expenses, Global Growth's spending

on private planes, and Global Growth's payments for a ghostwriter for Lindberg's book "Failing Early & Failing Often" were in violation of the TRO in the total amount of $52,424,571; (2) that certain transfers from the SACs to Lindberg's personal entities were in violation of the TRO; and (3) that certain transfers in a net total of $56,901,099 from SAC non-operating shell entities to Global Growth were in violation of the TRO. In holding Defendants in civil contempt, the trial court found Defendants were capable of purging their contempt by either using the proceeds from the sale of AAPC, or borrowing against their company interest, and ordered each Defendant to take the following steps to purge their contempt:

1. As to Defendant [Global Growth]:

   a. Pay $56,901,099 for the benefit of the FinCo entities;

2. As to Defendant Lindberg:

   a. Pay $52,424,571 for the benefit of [Global Growth];

   b. Pay $964,429 for the benefit of GB Capital;

   c. Pay $1615 for the benefit of Eli Global, LLC;

   d. Pay $1,879,341 for the benefit of Eli Research, LLC;

   e. Pay $10,420,588 for the benefit of the ARM Companies; and

   f. Pay $85,000 for the benefit of the ECL Group;

On 18 September 2024, Defendants timely filed their notice of appeal.[2]

## II. <u>Jurisdiction</u>

The parties agree the Contempt Order on appeal is an interlocutory order as it does not resolve all pending claims. *North Carolina Dep't of Transp. v. Page*, 119 N.C. App. 730, 733 (1995) ("An order . . . is interlocutory if it is made during the pendency of an action and does not dispose of the case but requires further action by the trial court in order to finally determine the entire controversy.") An appeal of right lies directly with this Court from any interlocutory order of a superior court that affects a substantial right. N.C.G.S. § 7A-27(b)(3)(a) (2023). "The appeal of any contempt order, [] affects a substantial right and is therefore immediately appealable." *Guerrier v. Guerrier*, 155 N.C. App. 154, 158 (2002).

## III. <u>Defendants' Motion for Judicial Notice</u>

As an initial matter, we address Defendants' Motion for Judicial Notice. Defendants filed a Motion for Judicial Notice on 24 March 2025, requesting that we take judicial notice of one public record filed in the North Carolina state court system: a Motion to Dissolve the TRO and Motion to Discharge Limited Receiver and Special Master (the "Motion to Dissolve").

Pursuant to Rule 37 of the North Carolina Rules of Appellate Procedure, a

---

[2] Lindberg and Global Growth are the only Defendants subject to the trial court's contempt order; thus, Lindberg and Global Growth are the only Defendants to appeal.

party may request this Court to take judicial notice of matters outside of the record on appeal. *See Coiner v. Cales*, 135 N.C. App. 343, 346 (1999) ("[A] request that this Court take judicial notice of certain material must be made by motion pursuant to [N.C.R. App.] P. 37."). Defendants request that we take judicial notice of the Motion to Dissolve because "[t]he Motion to Dissolve provides record support for significant facts of" Defendants' appeal. We deny Defendants' Motion for Judicial Notice for two reasons.

First, the Motion to Dissolve and the contents therein are not matters that are subject to judicial notice. This Court may take judicial notice of "the public records of other courts within the state judicial system[,]" *see State v. Thompson*, 349 N.C. 483, 497 (1998), as well as "a fact which is either so notoriously true as not to be the subject of reasonable dispute or is capable of demonstration by readily accessible sources of indisputable accuracy[,]" *see West v. G. D. Reddick, Inc.*, 302 N.C. 201, 203 (1981). Our Supreme Court has described what kind of matters a court may properly take judicial notice of:

> A matter is the proper subject of judicial notice only if it is 'known,' well established and authoritatively settled. Matters of which a court will take judicial notice are necessarily uniform or fixed and do not depend on uncertain testimony. A disputable matter cannot be classified as common knowledge and will not be judicially recognized.

*Hughes v. Vestal*, 264 N.C. 500, 506 (1965) (citation omitted).

Here, the Motion to Dissolve, and its content therein, is—by its very nature—argumentative and the subject of dispute. Although Defendants assert one of the exhibits attached to the Motion to Dissolve shows Defendants allegedly purged their contempt when they completed their obligations under the MOU in October 2024, Plaintiffs contend the parties will dispute the legal effect of the Motion to Dissolve at the trial level. Where the Motion to Dissolve does not contain facts that are "well established and authoritatively settled[,]" such matters cannot be classified as common knowledge, and this Court will not judicially recognize such facts. *See Hughes*, 264 N.C. at 506.

Second, the Motion to Dissolve does not bear upon a fact crucial to the disposition of this appeal. It is well established this Court "may take judicial notice *ex mero motu* on 'any occasion where the existence of a particular fact is important . . . .'" *Lineberger v. N.C. Dep't of Correction*, 189 N.C. App. 1, 6 (2008) (quoting *West*, 302 N.C. at 203); *see also State v. Watson*, 258 N.C. App. 347, 352 (2018) (taking judicial notice of several documents, including a motion and order continuing sentencing, because the content within the documents contained "a fact critical to the disposition" of the appeal).

Here, our review of the Motion to Dissolve does not reveal any fact that is crucial in determining whether the trial court erred by holding Defendants in civil contempt. While Defendants argue they purged themselves of any possible contempt

by substantially complying with the MOU in October 2024, such action was after the contempt hearing, and what Defendants did *after* the contempt hearing has no bearing on whether Defendants were in willful contempt at the time of the contempt hearing. As such, the Motion to Dissolve, and its contents therein, is immaterial in deciding whether the trial court erred by entering the Contempt Order on 30 August 2024.

Therefore, we deny Defendants' request to take judicial notice of the Motion to Dissolve.

## IV. Analysis

On appeal, Defendants argue the trial court erred by issuing a contempt order that is not valid under North Carolina law. Specifically, Defendants argue the Contempt Order should be vacated for the following reasons: (A) the trial court's finding regarding Defendants' present ability to comply with the purge conditions is not supported by competent evidence; (B) the Contempt Order violates Article I, Section 28 of the North Carolina State Constitution; and (C) Defendants "have purged themselves of any possible contempt[.]" We address each argument, in turn.

### A. Present Ability to Comply with the Purge Conditions

Defendants first argue the trial court's finding that they had the present means and ability to comply with the purge conditions is not supported by competent evidence. We disagree.

When this Court reviews civil contempt orders, "we are limited to determining whether there is competent evidence to support the findings of fact and whether those findings support the conclusions of law." *Morris v. Powell*, 269 N.C. App. 496, 501 (2020); *see Hartsell v. Hartsell*, 99 N.C. App. 380, 385 (1990), *aff'd,* 328 N.C. 729 (1991) ("Findings of fact made by the judge in contempt proceedings are conclusive on appeal when supported by any competent evidence and are reviewable only for the purpose of passing upon their sufficiency to warrant the judgment."). In a contempt proceeding, "the trial court is the sole judge of credibility and weight of the evidence," *see Cnty. of Durham by & through Durham DSS v. Burnette*, 262 N.C. App. 17, 23 (2018), *aff'd,* 372 N.C. 64 (2019), and thus, "findings based on competent evidence are conclusive on appeal, even if there is evidence to the contrary[,]" *see Hancock v. Hancock*, 122 N.C. App. 518, 527 (1996) (citation and internal quotation marks omitted). Moreover, where an appellant fails to challenge specific findings of fact, the unchallenged findings of fact are "presumed to be supported by competent evidence and [are] binding on appeal." *Koufman v. Koufman*, 330 N.C. 93, 97 (1991); *see Yeun-Hee Juhnn v. Do-Bum Juhnn*, 242 N.C. App. 58, 62–63 (2015) ("However, [the] defendant fails to set forth any specific challenges to the findings of fact and instead presents a broad argument . . . . It is well established by this Court that where a trial court's findings of fact are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal."). "The trial court's conclusions of

law drawn from the findings of fact are reviewable *de novo.*" *Tucker v. Tucker*, 197 N.C. App. 592, 594 (2009) (citation and internal quotation marks omitted).

The purpose of civil contempt "is to provide a remedy for an injured suitor and to coerce compliance with an order[.]" *Blue Jeans Corp. v. Amalgamated Clothing Workers of Am., AFL-CIO*, 275 N.C. 503, 508 (1969). To hold an alleged contemnor in continuing civil contempt, the trial court must make four findings: "(1) the order remains in force, (2) the purpose of the order may still be served by compliance, (3) the non-compliance was willful, and (4) the non-complying party is able to comply with the order or is able to take reasonable measures to comply." *Shippen v. Shippen*, 204 N.C. App. 188, 190 (2010); *see* N.C.G.S. § 5A–21(a) (2023).

If a trial court holds a defendant in civil contempt, the trial court may order imprisonment of the defendant. N.C.G.S. § 5A–21(b) ("A person who is found in civil contempt may be imprisoned as long as the civil contempt continues . . . ."). Under N.C.G.S. § 5A-22, however, the court order "holding a person in civil contempt must specify how the person may purge himself of the contempt." N.C.G.S. § 5A-22(a) (2023). This Court has previously construed N.C.G.S. §§ 5A-21 and 5A-22 *in pari materia*, and "[w]hen so construed, these statutes require that a person have the present ability to comply with the conditions for purging the contempt before that person may be imprisoned for civil contempt." *McMiller v. McMiller*, 77 N.C. App. 808, 809 (1985). Accordingly, "[t]o justify conditioning [the] defendant's release from

jail for civil contempt upon payment of a large lump sum of arrearages, the district court must find as fact that [the] defendant has the present ability to pay those arrearages." *Id.*

"A general finding of present ability to comply is sufficient when there is evidence in the record regarding defendant's assets." *Watson v. Watson*, 187 N.C. App. 55, 66 (2007) (citing *Adkins v. Adkins*, 82 N.C. App. 289, 292 (1986)). This Court has held "present ability" includes "the present ability to take reasonable measures that would enable [the alleged contemnor] to comply[] with the order." *Jones v. Jones,* 62 N.C. App. 748, 749 (1983) (citation omitted). "Reasonable measures" that would enable a contemnor to comply with an order include borrowing money, selling property, or liquidating other assets. *See Gordon v. Gordon*, 233 N.C. App. 477, 484 (2014) (holding the plaintiff could take reasonable steps to comply with the order "by paying a portion of his $15,000 monthly income, taking out cash advances from his credit cards, ceasing to voluntarily pay the expenses of other family members, and/or transferring any expenses in excess of his income to his credit cards for those months"); *but see Jones,* 62 N.C. App. at 749 (holding the defendant could not take reasonable measures to comply with the order because the defendant's car was broken and the land he owned was already heavily mortgaged). Where a trial court finds the contemnor "owns some property or has some income," the trial court must also determine whether "the actual value of that property or the amount of income

[is] sufficient to satisfy the purge conditions." *See Burnette*, 262 N.C. App. at 38.

In *McMiller*, this Court held the trial court's findings of fact did not support holding the defendant in contempt because the trial court failed to make the requisite findings for a holding of contempt. 77 N.C. App. at 809. We noted that while the trial court made a finding regarding the defendant's past ability to comply with the order, the trial court failed to make a finding relating to the defendant's present ability to pay the arrearages necessary to purge himself from contempt. *Id.* at 810. Thus, because there was no finding regarding the defendant's present ability to comply with the order, this Court reversed the trial court's order. *Id.*

In *Adkins*, this Court considered what evidence is sufficient to support a trial court's finding that the contemnor had the present means to purge their contempt. 82 N.C. App. at 291. In *Adkins*, after the plaintiff and the defendant separated in 1969, the trial court ordered the defendant to pay $15.00 per week child support. *Id.* at 290. The defendant made some child support payments but stopped making the payments in February 1971. *Id.* In April 1985, the plaintiff filed a motion in the cause requesting the trial court hold the defendant in contempt for failing to pay the child support. *Id.* During the contempt hearing the following evidence was introduced: the defendant had put a new home up for sale "when the motion in the cause was filed; the defendant "owns a 280–Z, a new Monte Carlo, and a Ford Bronco;" and the defendant "owns at least three tractor-trailer trucks in his furniture business." *Id.* at

292. In finding the defendant had willfully failed to pay the ordered child support and had the present ability to comply with the order, the trial court held the defendant in civil contempt and ordered the defendant imprisoned "until such time as he paid $11,070 in arrearages and resumed the required $15.00 per week payments." *Id.* at 290.

On appeal, the defendant argued "the trial court erred in ordering him imprisoned without having established that he had property free and clear of any liens that he could use to presently purge himself of the alleged contempt." *Id.* at 291. In affirming the trial court's order, this Court clarified the standard for the present means to purge the contemnor's contempt:

> The standard is not having property free and clear of any liens, but rather that one has the present means to comply with the court order and hence to purge oneself of the contempt. Put differently, is the individual able to take reasonable measures to comply with the order? Reasonable measures may well include liquidating equity in encumbered assets.

*Id.* at 291–92. This Court then analyzed the trial court's finding of fact that "the defendant . . . presently possesses the means and ability to comply with" the order. This Court distinguished *McMiller* on the basis that the order in *McMiller* contained no finding pertaining to "the defendant's present means to purge himself of the contempt[.]" *Id.* at 292. In *Adkins*, however, the trial court did make the finding that the defendant had the "present means to comply[,]" and although the finding was not

specific, the finding was nonetheless "minimally sufficient to satisfy the statutory requirement for civil contempt[,]" and the uncontroverted evidence regarding the defendant's assets supported the trial court's finding. *Id.*

This case is also distinguishable from *McMiller*, because unlike the trial court in *McMiller*, the trial court here made four findings of fact relating to Defendants' present ability to comply with the order and present ability to purge their contempt:

> 84. At the Show Cause Hearing, Plaintiffs offered the testimony of John Hulbert, a representative of AAPC, a non-SAC in which Defendants hold an economic interest.
>
> 85. [] Hulbert testified that AAPC is owned by non-depository trust in which [Global Growth] owns an economic interest, such that any funds that flow to the trust could be distributed to [Global Growth]. He testified that neither [Global Growth] nor Lindberg can compel sale of AAPC, but they could block sale.
>
> 86. [] Hulbert testified that if AAPC were sold, after the company's existing debts were paid off, the remaining proceeds would flow to the trust and then could be distributed to [Global Growth]. He testified that such distributable proceeds likely would exceed $70 million.
>
> 87. Finally, [] Hulbert testified that AAPC had no objection to being sold for fair market price and otherwise fair terms. He estimated such sale could occur within six months to year. He testified that necessary precondition to engaging in costly and distracting sales process would be receiving assurances that [Global Growth] would not exercise its veto of any sale.

The trial court also took judicial notice of an order of the United States District Court for the Middle District of North Carolina indicating that Lindberg has a history

of using corporate assets to pay personal expenses:

> 80. On September 21, 2023, the United States District Court for the Middle District of North Carolina entered an Order finding, among other things, that "since the May 2022 Judgment, Defendant Lindberg gave significant monetary gifts to friends, made significant monetary transfers and payments for hundreds of thousands of dollars for [Lindberg's] girlfriend, purchased multiple homes for several million dollars, and made unexplained monetary transfers between entities that Defendant owns or maintains a beneficial interest in . . . which are outside of the ordinary course of business as they were for Defendant's personal expenses or personal benefit." . . . .
>
> 81. That court further found that "Defendant [Lindberg] uses various corporate entities for payment of his personal expenses, and admitted at the hearing this was specifically to avoid attachment of his personal accounts" . . . . That court further found, "Defendant has also been inconsistent in how he describes or discloses these assets, leading to further concern that the corporate structure he has created has been used to hide assets even from the state courts." . . . .

Although the trial court's findings do not specifically state Defendants had the present ability to purge their contempt, it is clear from the evidence that Defendants had the present ability to take reasonable measures to purge their contempt. *See Watson*, 187 N.C. App. at 66; *see also Plott v. Plott*, 74 N.C. App. 82, 85 (1985) ("Though the findings are not explicit, it is clear that plaintiff both possessed the means to comply with the order and has willfully refused to do so. While explicit findings are always preferable, they are not absolutely essential where the findings otherwise clearly indicate that a contempt order is warranted."). Moreover, because

unchallenged findings of fact are binding on appeal, and Defendants do not specifically challenge any of the trial court's findings of fact, Findings of Fact 80, 81, 84, 85, 86 and 87, pertaining to Defendants' present ability to purge their contempt, are binding on appeal. *See Yeun-Hee Juhnn*, 242 N.C. App. at 62–63; *see also Tucker*, 197 N.C. App. at 594 (holding the findings of fact regarding the contemnor's assets were binding on appeal because although the contemnor testified he spent the money before the contempt proceeding, the trial court found his testimony was not credible, and the contemnor did not challenge any of the factual findings on appeal).

In addition to the unchallenged findings of fact, the trial court made several conclusions of law[3] detailing Defendants' present ability to purge their contempt:

> 112. [Global Growth] and Lindberg failed to show that they lack the means to purge their contempt.
>
> 113. Defendants presented evidence regarding their supposed lack of liquid funds to satisfy an order to purge their contempt. However, the evidence at the Show Cause Hearing demonstrates that they have other assets available to purge their contempt.
>
> 114. The evidence presented at the Show Cause Hearing showed that [Global Growth] has an interest in AAPC as the recipient of any funds that would flow to the non[-

---

[3] Although the parties do not challenge the trial court's labeling, we note that these "conclusions of law" are more appropriately classified as "findings of fact" because they require "logical reasoning from the evidentiary facts[.]" *See Barnette v. Lowe's Home Centers, Inc.*, 247 N.C. App. 1, 6 (2016) ("Regardless of how they may be labeled, we treat findings of fact as findings of fact and conclusions of law as conclusions of law for purposes of our review."); *see also Peters v. Pennington*, 210 N.C. App. 1, 15 (2011) (treating a "finding of fact" as a "finding of fact" because, although labeled as a "conclusion of law," the trial court reached its determination "through logical reasoning from the evidentiary facts" (citation modified)).

]depository trust that owns AAPC. Moreover, Lindberg has an interest in these funds as the sole shareholder of [Global Growth]. The evidence further showed that AAPC has substantial value above its current debt burden. In other words, AAPC is a valuable asset in which the Defendants have an economic interest.

115. Moreover, the evidence showed that Defendants have the ability to turn their economic interest in AAPC into cash. The [c]ourt credits the testimony of [] Hulbert as AAPC's representative that AAPC would be willing to enter into a sale of the company if [Global Growth], and its controlling person Lindberg, would not exercise their veto of such a sale.

116. The evidence further supports the inference that, in the alternative, Defendants could borrow against or sell [Global Growth]'s interest in the trust that owns AAPC.

117. Defendants failed to credibly rebut the evidence regarding their ability to use AAPC as a potential source of repayment in an amount in excess of $70 million.

118. Although Defendants elicited testimony regarding the steps that would be necessary to sell AAPC, Defendants did not show that such steps are not reasonable measures. Defendants also failed to show that they could not take reasonable measures to borrow against or sell their interest in the trust that owns AAPC. The [c]ourt does not credit counsel's argument that such interest has no value because the argument had no basis in the evidence presented at the Show Cause Hearing.

119. Defendants otherwise failed to show that they lack the means to purge their contempt.

120. . . . . . The [c]ourt finds that Defendants have assets that could be liquidated to purge their contempt.

Here, assuming, *arguendo*, Defendants had challenged specific findings of fact,

our review of the Record shows there is competent evidence to support the trial court's factual findings. Although Defendants presented evidence indicating Global Growth did not have enough readily available cash to purge its contempt, counsel for Defendants conceded if AAPC were liquidated, the sale proceeds would "flow up" to Defendants. Hulbert testified that as long as Defendants gave assurances they would not use their veto power to block the sale of AAPC, the Board of AAPC would be willing to sell the company, from which the sale proceeds would go to Global Growth, and then to Lindberg as the sole shareholder of Global Growth. Moreover, while Defendants presented evidence indicating the process to sell AAPC would be a "very long" process, Plaintiffs presented evidence showing that on 2 June 2024, Lindberg submitted a "Motion for Order Approving Sale of Assets" in a separate case, stating there were several parties interested in purchasing AAPC assets, and the value of the AAPC's assets was approximately $2.6 billion. In considering the plethora of evidence before it, the trial court—as the sole judge of credibility—found Hulbert's testimony credible and Defendants' evidence "failed to credibly rebut" the evidence showing Defendants presently own a valuable asset that could be liquidated to purge their contempt. This Court will not reweigh the evidence on appeal, even if there is evidence to the contrary. *See Burnette*, 262 N.C. App. at 23; *see also Hancock*, 122 N.C. App. at 527.

Therefore, because the trial court's factual findings regarding Defendants'

present ability to comply with the purge conditions is supported by competent evidence, and the trial court's conclusion that Defendants have the present means and ability to comply with the order or are able to take reasonable measures is supported by the findings of fact, we are required to affirm this portion of the contempt order. *See Tucker*, 197 N.C. App. at 597.

Defendants nonetheless argue "there is absolutely nothing Lindberg can do to immediately, or even reasonably quickly, comply with the" Contempt Order. Defendants further assert, "[o]ther courts, when faced with similar situations, have allowed defendants a reasonable time to pay ordered amounts." The standard, however, is not whether an individual has property or assets that can be "quickly" liquidated to purge their contempt, but rather, whether the individual has the present ability to comply with the order "by either making immediate payment *or* by taking reasonable measures[.]" *See Teachey v. Teachey*, 46 N.C. App. 332, 335 (1980) (emphasis added); s*ee also Adkins*, 82 N.C. App. at 291. Generally speaking, selling any real property, liquidating any asset, or borrowing money can be difficult and can take an indefinite amount of time, yet these methods are reasonable measures the contemnor can take to purge their contempt. *See generally, e.g., Tucker*, 197 N.C. App. at 597 (affirming the trial court's order holding the defendant in contempt because the uncontested facts regarding the defendant's "401K money, [] cashier check, [] boat, and motor vehicle" supported the trial court's conclusion of law that the

defendant had the present means and ability to comply with the order or take reasonable measures that would enable him to comply with the order). Trial courts, however, are not required to give contemnors a "reasonable time" after the entry of an order to sell their property or liquidate their assets to acquire funds to satisfy their purge conditions. *See Adkins*, 82 N.C. App. at 290 (affirming the trial court's order holding the defendant in civil contempt and imprisoning him until he purged his contempt).

Here, based on the evidence, the trial court made several findings of fact showing Defendants have assets they could liquidate to purge their contempt, and thus concluded Defendants had the present ability to comply. Accordingly, the evidence supports the trial court's findings of fact, and the findings of fact support the trial court's conclusion that Defendants could take reasonable measures to purge their contempt.

**B. Article I, Section 28 of the North Carolina State Constitution**

Defendants next argue the Contempt Order violates Article I, Section 28 of the North Carolina State Constitution. Specifically, Defendants assert that "[b]y ordering Lindberg to pay $65.7 million without any finding of fact that he has the current ability to do so, and without giving Lindberg any reasonable amount of time to do so, the Contempt Order effectively sentence[d] Lindberg to debtor's prison in violation of Article I, [Section] 28 of the North Carolina [State] Constitution." Contrary to

Defendants' assertion, however, we hold that Article I, Section 28 of the North Carolina State Constitution is inapplicable in the instant case.

Article I, Section 28 of the North Carolina State Constitution states, "[t]here shall be no imprisonment for debt in this State, except in cases of fraud." N.C. Const. art. I, § 28. Generally, North Carolina's constitutional provision against imprisonment for a debt "is only applicable to actions arising out of or founded upon contract." *State v. Locklear*, 21 N.C. App. 48, 50 (1974) (holding taxes do not constitute a debt within the meaning of Article I, Section 28 because taxes "are not [] contractual obligations of the taxpayer to the state"). Article I, Section 28 is *not* applicable, however, where the court imprisons the defendant, not for the defendant's inability to pay, but for his willful disobedience of a court order. *See Cobb v. Cobb*, 54 N.C. App. 230, 234 (1981) (dismissing the defendant's argument that the contempt order violates the constitutional provision against imprisonment for a debt because the contempt order sought to enforce the divorce decree between the parties); *see also Wilson v. Wilson*, 261 N.C. 40, 44 (1964) ("A willful failure of the husband to comply with the court's order is a contempt, and can be punished as such by imprisonment. It is not within the constitutional inhibition against imprisonment for debt.").

Here, because the trial court held Defendants in civil contempt and ordered Defendants to be imprisoned for their willful noncompliance with the TRO—not for their inability to pay—North Carolina's constitutional provision against

imprisonment for a debt is inapplicable. *See id.* at 231. Accordingly, we dismiss Defendants' argument that the Contempt Order violates Article I, Section 28 of the North Carolina State Constitution.

### C. Compliance at the Time of the Contempt Hearing

Defendants lastly argue the Contempt Order is invalid because Defendants have purged themselves of any possible contempt, and because the Record lacks competent evidence showing Defendants were in violation of the TRO as of the date of the contempt hearing. Specifically, Defendants argue, pursuant to N.C.G.S. § 5A-23(a1), Plaintiffs had the burden to prove Defendants were in willful violation of the TRO, and Plaintiffs failed to do so because "Miller's affidavit can in no way prove, one way or another, whether Defendants[] were in continuing violation of the MOU or TRO as of the date" of the contempt hearing. We disagree.

"Civil contempt or punishment [a]s for contempt is applied to a continuing act, and the proceeding is had to preserve and enforce the rights of private parties to suits and to compel obedience to orders and decrees made for the benefit of such parties." *Rose's Stores, Inc. v. Tarrytown Ctr., Inc.,* 270 N.C. 206, 214 (1967) (citations and internal quotation marks omitted). Thus, "a district court[] 'does not have the authority to impose civil contempt after an individual has complied with a court order, even if the compliance occurs after the party is served with a motion to show cause why he should not be held in contempt of court.'" *Ruth v. Ruth*, 158 N.C. App.

123, 126 (2003) (quoting *Reynolds v. Reynolds*, 147 N.C. App. 566, 573 (2001)). This Court will affirm the trial court's contempt order, however, where the contemnor has the burden of showing why he should not be held in contempt, and he fails to carry that burden. *See Plott*, 74 N.C. App. at 86 (affirming the trial court's order because the plaintiff failed to carry her burden, and thus, "the court was warranted in finding her in contempt").

To determine which party has the burden of proof, we must consider how the civil contempt proceedings were initiated. *See* N.C.G.S. § 5A-23 (2023). Proceedings for civil contempt may be initiated in one of three ways:

> (1) by the order of a judicial official directing the alleged contemnor to appear at a specified reasonable time and show cause why he should not be held in civil contempt;
>
> (2) by the notice of a judicial official that the alleged contemnor will be held in contempt unless he appears at a specified reasonable time and shows cause why he should not be held in contempt; or
>
> (3) by motion of an aggrieved party giving notice to the alleged contemnor to appear before the court for a hearing on whether the alleged contemnor should be held in civil contempt.

*Moss v. Moss*, 222 N.C. App. 75, 77 (2012) (citation modified); *see Plott*, 74 N.C. App. at 85 ("Civil contempt proceedings are initiated by a party interested in enforcing the order by filing a motion in the cause. The motion must be based on a sworn statement or affidavit from which the court determines there is 'probable cause to believe that there is civil contempt.'" (quoting N.C.G.S. § 5A-23 (1979))).

The method used to initiate the contempt proceedings determines which party carries the burden:

> Under the first two methods for initiating a show cause proceeding, the burden of proof is on the alleged contemnor. However, when an aggrieved party rather than a judicial official initiates a proceeding for civil contempt, the burden of proof is on the aggrieved party, because there has not been a judicial finding of probable cause.

*Moss*, 222 N.C. App. at 77 (citations modified). Where the alleged contemnor refuses to present evidence showing why he should be held in contempt, he does so "at his own peril." *Hartsell*, 99 N.C. App. at 387.

Here, the proceeding was initiated by Plaintiffs filing a Verified Renewed Motion for Order to Show Cause, and the trial court entering an order, finding probable cause to believe Defendants were in civil contempt and directing Defendants to appear and show why they should not be held in civil contempt. As such, Defendants had the burden to prove why they should not be held in civil contempt. *See Moss*, 222 N.C. App. at 77. Moreover, Defendants never objected to the trial court's allocation of the burden of proof, and thus, Defendants have waived "the right to complain about this" on appeal. *See id.* at 79 (holding the defendant waived the right to argue the trial court erred by misallocating the burden of proof to her because she failed to object to the trial court's action).

Defendants concede Miller's affidavit "demonstrated finite points in time wherein Defendants[] were out of compliance," but nonetheless rely on *Pocoroba v.*

*Gregor* to argue that their past noncompliance with the TRO alone is insufficient for civil contempt. 296 N.C. App. 508 (2024). Defendants' reliance, however, is misplaced.

In *Pocoroba*, the plaintiff had obtained a no contact order against the defendant after the defendant attempted to break into the plaintiff's house. *Id.* at 508. The no contact order prohibited the defendant from, *inter alia*, coming within one hundred feet of the plaintiff. *Id.* The year after the plaintiff obtained the no contact order, the trial court found that the defendant had violated the no contact order on two separate occasions. *Id.* at 509. In reversing the trial court's order, this Court reasoned that the trial court's findings were insufficient to support an order holding the defendant in civil contempt because even though the trial court found the defendant had violated the order in the past, the trial court failed to find the defendant was in violation of the court order at the time of the hearing. *Id.* at 510. The trial court's findings regarding the defendant's past noncompliance, as this Court noted, were more likely to support an order holding the defendant in criminal contempt, not civil contempt. *Id.*

Unlike the trial court in *Pocoroba*, however, the trial court in the instant case made the following findings of fact regarding Defendants' violations of the TRO in the past *and* as of the date of the hearing:

> 50. From October 2019 through April 2022, [] Miller identified net total of $131,266,348 that was transferred from SACs to [Global Growth]. This included $314,568,897 in gross funds moved from SACs to [Global Growth], offset

by $183,302,549 that [Global Growth] transferred to SACs. . . .

51. During the same period, [Global Growth] received a total of $58,544,722 from non-SACs. [Global Growth] also transferred a total of $41,774,468 to the Lindberg Personal Vehicles. . . .

52. Defendants argued that this analysis showed that funds from the non-SACs were sufficient to pay for the $41,774,468 that went from [Global Growth] to the Lindberg Personal Vehicles. While it is true that $58 million is greater than $41 million, [] Miller's analysis shows that the $58 million from non-SACs was not, in fact, used for the $41 million in transfers from [Global Growth] to the Lindberg Personal Vehicles. Paragraphs 89 and 90 of her affidavit show that almost all of the $58 million in cash from the non-SACs came from the refinancing of AAPC, which occurred in March 2022. . . . . By contrast, [Global Growth] sent to the Lindberg Personal Vehicles over $3.5 million in October through December 2019, over $6 million in 2020, over $15 million in 2021, and over $16 million in January through April 2022. During all of those periods, the only way [Global Growth] could have had the funds to make those transfers to the Lindberg Personal Vehicles was by using the cash it received from the SACs. . . .

53. Defendants presented no evidence that [Global Growth] later returned the cash it had received from the AAPC refinancing to the SACs to reimburse them for the funds that [Global Growth] took from the SACs and then sent to the Lindberg Personal Vehicles.

54. In other words, [] Miller's analysis shows that the transfers from [Global Growth] to the Lindberg Personal Vehicles were only possible due to funds that originated with the SACs. [Global Growth] did not then replace the funds it received from the SACs.

. . . .

> 61. To the extent that Defendants argue that the transfer of net total of $58,544,722 from the non-SACs to [Global Growth] has cured their violation, . . . the [c]ourt rejects that argument. Defendants also presented [] Gaddy's testimony that [Global Growth] has not recently had access to liquid assets in excess of $250,000. Accordingly, the funds from the non-SACs are no longer are in [Global Growth]'s possession. [Global Growth] has not presented evidence that [Global Growth] then spent the money on permitted uses. Defendants did not present evidence that the $58,544,722 that non-SACs transferred to [Global Growth] subsequently was spent on ordinary business operations. The [c]ourt further notes that Table of [] Miller's report, which covers longer time period, shows that [Global Growth] sent a net total of $64,174,784 to the Lindberg Personal Vehicles.

While Defendants challenge the sufficiency of the evidence, Defendants failed to challenge any specific finding of fact; thus, these findings are binding on appeal. *See Yeun-Hee Juhnn*, 242 N.C. App. at 62–63; *see also Tucker*, 197 N.C. App. at 594. Accordingly, we limit our consideration to whether the findings of fact in this case support the trial court's conclusions of law. *See Morris*, 269 N.C. App. at 501.

Here, although Miller's affidavit contained an analytical report discussing the Defendants' financial records from October 2019 to January 2023, Defendants concede that Miller's affidavit does identify "finite points" at which Defendants were not in compliance with the TRO. Indeed, Plaintiffs presented evidence that Defendants violated the TRO, but Defendants—not Plaintiffs—had the burden to show they were no longer in violation of the TRO by the date of the contempt hearing. *See Ruth*, 158 N.C. App. at 126. Yet, the trial court found that Defendants, to their

own peril, did not present any evidence showing that Global Growth had transferred the money back to the SACs. *See Hartsell*, 99 N.C. App. at 387. Moreover, while Defendants argued at the hearing that the transfer of net total of $58,544,722 from the non-SACs to Global Growth cured their violation, the trial court found Defendants' evidence was not credible, because at the time of the hearing, the funds were no longer in Global Growth's possession, and Defendants did not present any evidence that the funds were spent on uses permitted by the TRO. Without credible evidence to rebut Plaintiffs' evidence showing that Defendants had violated the TRO, the trial court based its factual findings on competent evidence, and the factual findings support the trial court's conclusion that Defendants were in violation of the TRO at the time of the contempt hearing. *See Hancock*, 122 N.C. App. at 527. Therefore, the trial court did not err in holding Defendants in civil contempt.[4]

## V. Conclusion

Accordingly, for the foregoing reasons, we affirm the trial court's order holding Defendants in contempt.

---

[4] To the extent Defendants argue the Contempt Order is contrary to North Carolina law because as of "October 2024, the parties to this action accomplished the very thing the trial court concluded would purge Defendants of any civil contempt[,]" we decline to entertain such argument. Whether Defendants complied with the TRO *after* the contempt hearing or otherwise purged their contempt has no bearing upon our decision in the instant case. *See Hancock*, 122 N.C. App. at 522 (dismissing the plaintiff's argument that she had purged herself of her contempt after the contempt hearing because the "information [was] not part of the official record and ha[d] no bearing upon our decision").

AFFIRMED.

Judges TYSON and HAMPSON concur.